KAREN A. OVERSTREET
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Rm. 6301
Seattle, WA 98101-1271
(206) 370-5330

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 7 |
| JONATHAN WULF, | ) | |
| | ) | Bankruptcy No. 07-14288 |
| | ) | |
| Debtor. | ) | |
| | ) | **MEMORANDUM DECISION ON MOTION** |
| | ) | **TO DISMISS CASE UNDER 11 USC** |
| _____ | ) | **§§ 707(b)(1) and (3)** |

    This matter came before the Court on the United States
Trustee's Motion to Dismiss for abuse under 11 U.S.C.
§§ 707(b)(1) and (3).[1]  This is not a case where the presumption
of abuse arises under § 707(b)(2)(A)(i).  Rather, the United
States Trustee contends that under the facts of this case,
granting relief under Chapter 7 would be an abuse either because
the debtor, Jonathan Wulf (the "Debtor"), filed the petition in
bad faith, § 707(b)(3)(A), or, based on a totality of the
circumstances, the Debtor's financial situation demonstrates
abuse, § 707(b)(3)(B).  The Debtor opposed the motion and the
Court heard oral argument on January 18, 2008.

    Due to the importance of the issues presented, the Court

_____

    [1] Unless otherwise indicated, all Chapter, Section and Rule
references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*
and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et
seq.*

Memorandum Decision - 1

took the matter under advisement. Based on the pleadings and the record, and applicable case law, the Court finds that granting Chapter 7 relief to the Debtor would be an abuse.

## I. FACTUAL BACKGROUND

This case was filed on September 11, 2007. The Debtor is a psychologist at Swedish Hospital with steady employment and primarily consumer debts. He was divorced in 2001 and is currently unmarried. He has two adult daughters for whom he no longer has court-ordered child support payments. Starting in 2002, the Debtor voluntarily took on parent loans for six years of his daughters' combined college costs, totaling $50,000, and paid approximately $20,000 in out-of-pocket costs related to their education. Declaration of Jonathan Wulf ("Wulf Decl."), paras. 4, 5 and 7. The Debtor had previously incurred approximately $45,000 of his own student loan debt. *Id.*, para. 1. Schedule F, as amended (docket no. 10), lists $100,000 in student loan debt owed to Sallie Mae, incurred from 1989 to 2006, and Schedule J lists student loan payments of $700/month.[2]

In August 2006, the Debtor contacted an attorney about the possibility of filing a bankruptcy. At that time he was told he would not qualify for a chapter 7 because of his income, even though he had "high debt and very little disposable income." Wulf Decl., para 9.

---

[2] All versions of schedule J filed by the Debtor indicate a $700 per month student loan payment. The Debtor's declaration, paragraph 9, however, states that his loan payments were $950 per month. At the hearing, Debtor's counsel indicated that the loans had been consolidated to the $700 per month amount.

Memorandum Decision - 2

In March of 2007, despite his financial problems, the Debtor purchased his current residence, a two-bedroom condominium, for approximately $355,000. *See* Transcript of Debtor's 341 testimony, attached to Declaration of Sheila O'Sullivan, docket no. 20 ("341 Testimony"). The monthly mortgage payments on the condominium are $3,138.92[3], plus $442 in homeowner's dues. The Debtor had previously rented a one-bedroom apartment for $1,095 per month. The Debtor's declaration states that he purchased the condominium because he anticipated his apartment rent was going to increase by $250 per month and he had "heard rumors" that the apartment building could be converted to condominiums. Wulf Decl., para. 10. The Debtor stated he also wanted a two-bedroom unit to accommodate his daughter when she visited from college. *Id.*

On the loan application for the condominium purchase, the Debtor listed his monthly income as $14,000. 341 Testimony, p. 3. The Debtor's means test forms and schedules, however, demonstrate that his actual monthly income at the time was closer to $7,000. *Id.* During the year prior to filing bankruptcy, the Debtor incurred over $20,000 in credit card debt in the form of cash advances. 341 Testimony, p. 7. That money was used in part

---

[3] There are discrepancies in the documents filed as to whether the $3,138.92 includes King County property taxes of $268.33 per month. On Schedule J, the Debtor consistently lists his mortgage payment as $3,138.92, inclusive of real estate taxes. The initial means test form, line 42, gave an inclusive number of $3,849.99 for the condominium payment. The subsequent amended means test form omitted property taxes but stated a monthly payment for the mortgages and homeowner's dues of $3,581.66. This discrepancy was not resolved at the 341 meeting. *See* 341 Testimony, p. 4-5.

Memorandum Decision - 3

to inflate his checking account so that he would qualify for the loan on his condominium purchase. *Id.*, p. 6. The funds were also used for living expenses, including the purchase of a 1986 BMW 535i.[4]

Determining the Debtor's income has been somewhat of a moving target. Three sets of schedules I and J have been filed, as summarized below:

| Date of Schedules I and J | Monthly Gross Income | Average Monthly Income | Expenses | Net Income |
|---|---|---|---|---|
| Initial Schedules filed 9/11/07 | $7,894.92 | $5,346.85 | $6,049.50 | $702.65 |
| Second set: Amended I filed 10/18/07; amended J filed 11/20/07 | $7,894.92 | $6,332.69 | $5,999.50[5] | $333.19 |
| Third set of Schedules I and J filed 1/21/08[6] | $6,880.00 | $5,332.36 | $5,999.50 | $677.14 |

The Debtor's income and expenses are also set forth in the

[4] The Debtor's schedules indicate he also owns a 1995 Isuzu Rodeo.

[5] The difference is due to a reduction in the line item for telephone, which went from $175 to $125.

[6] During oral argument on the instant motion, the Debtor's counsel raised a concern that the Debtor's income figures were incorrectly stated on the amended Schedule J and the amended means test form. Counsel contended that the Debtor's annual income was closer to $81,000 than $94,000. After the hearing, the Debtor filed third amended Schedules I and J and an amended means test form. *See* Declaration of Sheila O'Sullivan, docket entry #22, and the amended pleadings referred to therein. The United States Trustee filed a response to the new numbers. *See* docket entry #25.

Memorandum Decision - 4

Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, Form 22A. The initial means test form filed by the Debtor on September 12, 2007 ("First Means Test"), stated a gross monthly income of $7,428.29, annualized to $89,146.88. The total expenses allowed under the IRS standards listed on line 33 were $3,618.99. An amended means test form was filed on November 20, 2007 ("Second Means Test"), stating the same gross income, but with different deductions under Part V. After the hearing, a third amended means test form was filed ("Third Means Test"), this time reflecting monthly gross income of $6,898.26, annualized to $82,779.12. The various means test forms also differ in terms of the deductions claimed. The differences are summarized below:

| line item/description | First Means Test (9/12/07) | Second Means Test (11/20/07) | Third Means Test (1/21/08) |
|---|---|---|---|
| 3. Gross wages monthly | $7,428.89 | $7,428.89 | $6,898.26 |
| 19. food, clothing, misc. | $916.00 | $1,306.00 | $1,306.00 |
| 20B. (b) avg monthly payment for debts secured by home | $3,849.99 | $3,581.66 | $3,581.66 |
| 25. Other necessary expenses: Taxes | $1,526.99 | $1,526.99 | $1,417.93 |
| 33. Total Expenses Allowed under IRS Standards | $3,618.99 | $ 4,008.99 | $4,099.93 |
| 42. Future payments on secured claims | $3,849.99 | $3,581.66 | $3,581.66 |
| 47. Total deductions under § 707(b)(2) | $7,468.98 | $7,590.65 | $7,681.59 |

Memorandum Decision - 5

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## III. ANALYSIS

**A.   The Debtor's Income and Expenses on the Means Test Form.**

**1.   Actual Means Test Form Numbers.**

As stated above, the Debtor has twice amended the means test form. The first two forms stated the Debtor's gross wages to be $7,428.89. In the Third Means Test, however, the Debtor states he has $6,898.26 in "Current Monthly Income" as that term is defined in § 707(b)(7). The United States Trustee has taken issue with that number. *See* Supplemental Declaration of Martha A. Van Draanen, docket entry no. 25. Using the Debtor's pay advices for the six months prior to the filing of the petition, the United States Trustee calculates the Debtor's "Current Monthly Income" at $7,429. *Id.* The difference is a result of how the number of applicable pay periods is calculated. According to the United States Trustee's computation, although there are 26 pay periods in a year, the six month time period prior to the Debtor's filing actually contained 14, rather than 13, pay periods. The United States Trustee's calculation comports with the amount listed by the Debtor on the First Means Test and Second Means Test filed herein. For the purposes of this motion, the Court therefore finds the Debtor's "Current Monthly Income" to be $7,429.

In the Third Means Test, the Debtor claims total deductions

Memorandum Decision - 6

(line 47) of $7,681.59, including both a vehicle operation expense of $529 (line 22) and a vehicle ownership expense of $471 (line 23). Because the Debtor owns his vehicle free and clear of liens he is not entitled to the ownership expense deduction. *See Ransom v. MBNA America Bank, N.A. (In re Ransom)*, BAP No. NV-07-1254 (9th Cir. BAP 2007); *In re Patricia Ann Cole*, 07-10264-KAO, Memorandum Decision, docket entry no. 30. As noted above in footnote 3, it does not appear that the real estate taxes on the condominium of $268.33 have been included in line 42 of the deductions. Finally, at line 25, the Debtor lists taxes of $1,417.93, yet the third amended Schedule I lists taxes as $1,414.66. Using the $1,414.66 amount, and making the other changes noted above, the Debtor's total deductions in line 47 should be $7,475.65, which is just slightly over his monthly gross income of $7,429.

**2. Hypothetical Means Test.**

The United States Trustee has not suggested that the Debtor bought the condominium for the sole purpose of avoiding the presumption of abuse under the means test. The Debtor admits in his declaration, however, that when he consulted a bankruptcy attorney in August of 2006, he was told that because of his high income he would not qualify for chapter 7 relief and would instead have to file a chapter 13. The Debtor's purchase of the condominium significantly increased his secured debt enabling him to pass the means test under chapter 7, at least on a mathematical basis.

Comparing the Debtor's actual means test figures, as revised

Memorandum Decision - 7

above, to how the Debtor's means test form would have looked had he <u>not</u> purchased the condominium is very instructive. On line 20B of the means test form (Local Standards: housing and utilities), instead of zero, the Debtor would have been entitled to the housing allowance for King County of $1,205, increasing his IRS allowed deductions to $4,830.66 on line 33. The Debtor would not have been able to deduct $3,581.66 for mortgage expenses on line 42. Instead, the amount on that line would have been zero. Thus, his total allowed deductions on line 47 would have been $4,830.66. Deducting that amount from current monthly income of $7,429 would leave $2,598.34 in monthly disposable income on line 50. If that amount is then multiplied by 60 months (because the Debtor is an above median income debtor), the total is $155,900.40. This amount is 70% of the Debtor's total nonpriority unsecured debt of $222,634, significantly in excess of the threshold amount of 25% of unsecured debt used under § 707(b)(2), which would be $55,658.50.

As of March 2007, when the Debtor purchased the condominium, his financial circumstances were as described in his declaration. He had become divorced from his wife and in that process assumed their community debt. He had student loans for himself and his daughters' college education in the amount of $100,000. He had revolving consumer debt approaching $100,000. Wulf Decl., paras. 5 - 8. At the same time, the Debtor had average monthly income of about $7,429, and his rent was only $1,095 per month. 341 Transcript, p. 4. Based on the hypothetical above, he would have had $2,598.34 in monthly disposable income to pay his student

Memorandum Decision - 8

loan of $700 plus a substantial dividend to his other unsecured creditors.  Instead of pursuing a chapter 13 plan under those terms, however, the Debtor obtained a loan to purchase a condominium he clearly could not afford, based upon a falsified mortgage loan application, using cash advances from credit cards to inflate his bank account to make it appear he had sufficient cash to support the mortgage loan.  After qualifying for the loan, the Debtor did not repay the cash advances to the credit card companies from which he obtained the funds; instead, he spent the money on unspecified living expenses and the purchase of a used BMW.  341 Transcript, p. 7.

The means-test format has been criticized as providing debtors an incentive to minimize their current monthly income while maximizing their allowed deductions.  *See Means Testing in the New § 707(B),* Judge Eugene Wedoff, 79 Am. Bankr. L. J. 231 242 (Spring 2005).  *See also Judicial Discretion to Find Abuse under § 707(B)(3)*, Judge Eugene Wedoff, 25-APR Am. Bankr. Inst. J. 1 (April 2006).  In this case, the hypothetical means test depicting the Debtor's financial situation before the condominium purchase suggests the Debtor did precisely what Judge Wedoff describes:  the Debtor's purchase of the condominium increased his allowed deductions so that he went from having $2,598.34 in monthly disposable income to having nothing to pay to unsecured creditors.

**B.    Determination of Substantial Abuse.**

Section 707(b) requires the court to determine, on a motion by the United States Trustee, whether granting relief under

Memorandum Decision - 9

chapter 7 would be "an abuse" of the provisions of chapter 7.
Prior to the enactment of the Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005 (BAPCPA), the test under § 707(b)
was for "substantial" abuse. Clearly, Congress has indicated an
intention that some level of abuse less than "substantial" will
now suffice. Section 707(b)(3) permits the court to dismiss a
case for abuse *even if* the presumption of abuse provided for in
§ 707(b)(2) does not arise. Section 707(b)(3) permits dismissal
if the "totality of the circumstances" demonstrates that
chapter 7 relief would be an abuse.

The totality of circumstances test is not new in the Ninth
Circuit. In *In re Price*, 353 F.3d 1135 (9th Cir. 2004), a case
decided prior to the enactment of BAPCPA, the Ninth Circuit
enumerated six factors to be considered in determining whether to
dismiss a consumer debtor's chapter 7 case as a "substantial
abuse" pursuant to the former version of § 707(b):

> 1) whether the debtor has a likelihood of sufficient future
> income to fund a Chapter 11, 12, or 13 plan which would pay
> a substantial portion of the unsecured claims;
>
> 2) whether the debtor's petition was filed as a consequence
> of illness, disability, unemployment, or some calamity;
>
> 3) whether the schedules suggest the debtor obtained cash
> advancements and consumer goods on credit exceeding his or
> her ability to repay them;
>
> 4) whether the debtor's proposed family budget is excessive
> or extravagant;
>
> 5) whether the debtor's statement of income and expenses
> misrepresents the debtor's financial condition; and
>
> 6) whether the debtor has engaged in eve-of-bankruptcy
> purchases.

*Price*, 353 F.3d at 1139. These factors, when applied to the

Memorandum Decision - 10

circumstances in this case, mandate the denial of chapter 7 relief to the Debtor.

Prior to the condominium purchase in March 2007, the Debtor certainly had the future income to repay a substantial portion of his debts under a chapter 11 or 13 plan, even allowing for the $100,000 in college expenses he voluntarily assumed. The Debtor's prebankruptcy decision to devote 57% of his income to a condominium purchase dramatically altered the landscape for his unsecured creditors.

The Debtor's housing expenses after the condominium purchase are excessive. Although the Court does not hold as a matter of law that a bankruptcy filing is abusive if a debtor spends 57% of his or her monthly income on home ownership expenses, under the facts of this case, the housing expense is excessive. Further, given the unique facts of this case, the Court considers the Debtor's purchase of a $355,000 condominium within the six months preceding the filing to be an "eve of bankruptcy" purchase.

Even if the Debtor retains the condominium, it appears he could fund a plan that would pay at least 25% to his unsecured creditors. The Debtor's most recent Schedule J includes monthly transportation costs of $364.58, in addition to monthly parking, recreation costs of $200, and pet care of $60, all of which appear to be excessive given the circumstances. Schedule J includes $45 for water and sewer which are covered by the Debtor's homeowners' dues (341 Transcript, p. 10 - 11), and $50 as support for dependents, despite the fact that the Debtor's daughters are both over 20 years old. The student loan expense

Memorandum Decision - 11

of $700 can be paid through a chapter 13 plan. In order to pay 25% of his unsecured debt of $224,634, the Debtor must make a monthly payment of at least $936. Admittedly, the budget to fund such a plan would be lean. However, the Debtor took a gamble in buying the condominium - at the risk of his unsecured creditors - and will have to make sacrifices if he wants to retain the condominium at their expense.

There are no considerations of illness, disability or other calamity which precipitated the instant bankruptcy filing. The Debtor has been steadily employed as a professional. His purchase of the condominium certainly does not qualify as a legitimate consequence of financial hardship.

Finally, the record demonstrates that the Debtor took cash advances for the sole purpose of misrepresenting to his mortgage company that he had sufficient cash to qualify for a mortgage loan. There is no evidence that the Debtor had the ability to repay these cash advances; in fact, he used them for living expenses.

### CONCLUSION

Based upon the factors set forth in *Price*, and the totality of circumstances in this case, the Court concludes that granting chapter 7 relief to the Debtor would be an abuse. The Debtor will either have to pay his debts outside of bankruptcy or obtain a discharge through a payment plan under chapter 11 or 13.

Memorandum Decision - 12

The United States Trustee is instructed to submit an order consistent with the Court's ruling herein.

DATED this 26th day of February, 2008.

_____
KAREN A. OVERSTREET
United States Bankruptcy Judge

Memorandum Decision - 13